Fair Price Stations, Inc. v. Commissioner.
Fair Price Stations, Inc. v. Commissioner
Docket No. 6102.
United States Tax Court
1946 Tax Ct. Memo LEXIS 188; 5 T.C.M. (CCH) 401; T.C.M. (RIA) 46120; May 23, 1946
*188 Robert Critchfield, Esq., for the petitioner. A. J. Friedman, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: The Commissioner determined a deficiency in income tax for 1940 and 1941, in the amounts of $8,441.99 and $22,589.79, respectively, in declared value excess profits tax for 1941, in the amount of $6,124.01, and in excess profits tax for 1941, in the amount of $2,371.68. The question involved is whether the income of an alleged co-partnership for the years 1940 and 1941 was includible in the petitioner's taxable income for said years under the provisions of section 22(a) of the Internal Revenue Code. A stipulation of facts was filed. We adopt same by reference and find the facts therein set forth. Such parts thereof as it is considered necessary to set forth are included with other facts found from evidence adduced in our Findings of Fact The petitioner, Fair Price Stations, Inc., of Wooster, Ohio, was incorporated under the laws of the State of Ohio on July 10, 1931. The capital stock which the company was authorized to issue was 500 shares all of no par value. On March 11, 1935, the capitalization of the company was changed by increasing *189 the number of shares of common stock which the company was authorized to issue to 1000 all of no par value and by authorizing the issuance of 500 shares of 6 per cent preferred stock of the par value of $100 per share. The original subscribers to the capital stock of the company, the number of shares for which they subscribed and the amount of their investment were as follows: Ross K. Shoolroy
1 share
$ 100.00
Effie I. Shoolroy
53 shares
5,300.00
R. A. Rickett
1 share
100.00
J. B. Richards
55 shares
5,500.00
Total
110 shares
$11,000.00
At the time of the incorporation Ross K. Shoolroy was many thousand dollars in debt, but his wife, Effie I. Shoolroy, had separate independent funds arising from inheritance. On December 11, 1936, and January 1, 1937, the stock of petitioner was held as follows: R. K. Shoolroy - 1 share; Effie I. Shoolroy - 164 shares; Sophie B. Ross - 3 shares; R. S. Daugherty - 6 shares. * *190 On May 31, 1940, the stock was held as follows: R. K. Shoolroy - 179 shares; Effie I. Shoolroy - 185 shares; Sophie B. Ross - 10 shares; R. S. Daugherty - 10 shares; Julia Ann Shoolroy - 10 shares; Mary Elizabeth Shoolroy - 10 shares; Ross. S. Shoolroy, Jr., - 10 shares. All stock was paid for in cash, except 10 shares given to Julia Ann Shoolroy by R. K. Shoolroy, and 10 shares given to Mary Elizabeth Shoolroy by Effie I. Shoolroy, both gifts being made on July 1, 1938. Ross K. Shoolroy was appointed guardian of Julia Ann Shoolroy and Mary Elizabeth Shoolroy by the Probate Court of Wayne County, Ohio, about March 1938. The petitioner was engaged in a "cut rate" gasoline filling station business and during the period from 1931 to 1938 acquired eight stations in the state of Ohio; six owned in fee simple and two erected on leased land. The petitioner operated its stations until the first of January, 1937. On December 11, 1936, at a special meeting of the stockholders of Fair Price Stations, Inc., there was passed the following resolution: "Whereas the success of the corporation in its earning power is directly dependent upon the executive management and whereas as this management is limited *191 to a few persons, and whereas these persons now desire to devote their efforts as a co-partnership, it is resolved that the corporation lease all of its facilities to the partnership on the terms and conditions stipulated in a contract, a copy of which is herewith attached." On December 31, 1936, a partnership agreement was entered into between Ross K. Shoolroy, holding 51 per cent interest; Effie I. Shoolroy, holding 45 per cent interest; Sophie B. Ross, holding a 2 per cent interest and Ralph S. Daugherty, holding a 2 per cent interest. The name of the partnership was "Fair Price Stations." The purpose and business of the partnership was for the operation of retail gasoline stations, together with the merchandising of any and all commodities thereto, and doing all things necessary to the fulfillment and best management of such business. The capital contribution by the partners was $10,000 in ratio to their respective interest. This agreement also made provisions for salaries of the different partners [the amounts were left blank], the distribution of profits, the procedure in case of loss, the withdrawal at death of a partner, the control of all major issues by the majority interest *192 of the partnership. A partnership return was filed for the year 1937 with the collector of internal revenue, 18th district of Ohio, at Cleveland, Ohio, and with the exception of an adjustment of $301.27 made to net income, such partnership return for the year 1937 was accepted. After the partnership, known as Fair Price Stations, had operated the stations owned by the petitioner for about one year under the arrangement referred to in the resolution of December 11, 1936, the agreement which existed between the partnership and the petitioner was terminated by mutual consent on January 1, 1938. By the year 1940 Ross K. Shoolroy was president of the petitioner, and had expanded his business interests, being president and general manager of The Red Head Oil Company of West Virginia, vice president of Railway Oil Stores, Inc., and vice president of Red Head Oil Company of Ohio. Up to May 1940, the stations were pumping and selling gasoline at the rate of about 500,000 gallons a month. In May 1940, it was decided to operate the gasoline stations under a partnership arrangement similar to the arrangement which was entered into at the beginning of 1937. Accordingly, another partnership agreement *193 was entered into on May 31, 1940, in the same form of instrument, and in most material respects the same as the partnership contract of December 31, 1936. In material part, it provided that the name of the partnership should be "Fair Price Stations," also: ARTICLE 2. The purpose and business of said partnership shall be the operation and retail gasoline stations, together with the merchandising of any and all commodities thereto, and doing all things necessary to the fulfillment and best management of such business. ARTICLE 3. The amount of capital with which the Partnership shall start to do business shall be Twenty Thousand ($20,000.00) Dollars which is subscribed hereto in proportion to the respective interests of the Partners: Partner-
ship
Amount of
Interest
Subscription
Ross K. Shoolroy
40%
$ 8000.00
Effie I. Shoolroy
40%
8000.00
Ross S. Shoolroy, Jr.
6%
1200.00
Julia Ann Shoolroy
3%
600.00
Mary Elizabeth Shoolroy
3%
600.00
Sophie B. Ross
4%
800.00
Ralph S. Daugherty
4%
800.00
Total
100%
$20000.00
ARTICLE 4. Said partnership shall commence on the 1st day of June 1940, and shall continue for a period of one year from and after said date, unless sooner dissolved by the death, bankruptcy, insolvency or disability *194 of either of the parties hereto, or unless terminated under the provisions hereof. And said partnership may be continued from year to year after the expiration of the first year, at the election of all the partners hereto. ARTICLE 5. The said Ross K. Shoolroy shall generally manage the entire business of the partnership, and shall do and perform and oversee all acts, and conduct the affairs of the partnership in the capacity of General Manager. He shall receive therefore [therefor] the salary of $ per month, and in addition thereto, he shall receive a sum equal to forty (40%) per cent of the net profits of said partnership. after the deduction of salaries of the other partners, and after the deduction of his own salary, upon the taking of the annual account and inventory as hereinafter provided. Other members of the Partnership shall receive salaries as may be mutually agreed upon between the partners from time to time, except no partner shall receive any salary unless devoting his or her time to the business. The profits of the Partnership shall be divided ratably among the Partners in proportion to their interest in the Partnership as shown in Article 3. Such division of profits *195 shall be after the deduction of all salaries of the Partners. ARTICLE 6. Each partner may make and take contracts for and on behalf of the partnership business, but no contract or purchases involving the liability exceeding One Hundred Dollars ($100.00) nor any transaction out of the usual course of business, shall be made or entered into without the full consideration, consultation and the approval of a majority of the interests of the other partners. * * *
ARTICLE 8. Proper books of account shall be kept by said partnership under the charge of said Sophie B. Ross and/or Ross S. Shoolroy, in which shall be promptly entered an account and record of all the transactions and business of the partnership. * * * Article 9. * * * All disbursements and partnership moneys shall be made by check, and said checks shall be made in the name of the Partnership, and countersigned by Ross K. Shoolroy and/or Sophie B. Ross. * * *
ARTICLE 11. * * * all losses shall accrue to each of the partners according to their respective interest in the partnership. ARTICLE 12. Some time between the fifteenth and twenty-fifth of each and every month Sophie B. Ross and/or Ross S. Shoolroy, or the bookkeeper in charge, *196 shall make a true and correct statement of the business and shall furnish each Partner a copy of the same. * * * ARTICLE 13. Within thirty days after the close of the year during the continuance of such partnership, an account shall be taken of all the assets and liabilities of said firm, and an inventory of all assets and property shall be made at the true value thereof. Said account shall be entered in a separate book kept for that purpose, and shall be signed by all the partners, and shall be binding upon each of them. If losses shall have been suffered during any year, so that the value of the assets of the partnership, after deducting the liabilities thereof, shall be less than the amount of the capital of said partnership originally invested, then the entire amount of such deficiency shall, immediately after the signing of the annual account showing such deficiency, be made up in cash by said partners to said firm in the following proportions: 40% Ross K. Shoolroy 40% Effie I. Shoolroy 6% Ross S. Shoolroy, Jr. 3% Julia Ann Shoolroy 3% Mary E. Shoolroy 4% Sophie B. Ross and 4% Ralph S. Daugherty * * *
ARTICLE 15. Either of the partners may, at any time after the expiration of thirty *197 days of the date hereof, dissolve said partnership by written notice of his intention so to do, delivered and mailed to each of the other partners, and said partnership shall be dissolved within thirty days after the giving of such notice, provided however, that on dissolution of said partnership, or the retirement of any partner, either of the remaining partners or all of them shall have the right and option of purchasing the interest of such retiring or dissolving partner, by giving notice to such partner or his personal representatives, in writing, of his or her intention so to do, within thirty days after the giving of such notice of intention to dissolve or retire from the partnership. The price to be paid for such share of such retiring partner shall be that sum which represents the percentage of interest of such retiring partner in the capital of the partnership on the first day of the month prior to the time of the giving of the notice to retire. ARTICLE 16. At the time of dissolution of said partnership, or any other termination thereof, an inventory and appraisal of all assets and property of said partnership shall be made, at the true value thereof, and an account shall *198 be taken of all assets and liabilities. After payment of all debts and liabilities of the partnership, the assets and property shall be divided between the partners in the proportion in which the capital of the partnership has been contributed by each, and each partner hereby agrees to execute all instruments necessary or proper to invest the others with the sole right to the property apportioned to them. * * *
The partnership agreement was signed by Ross K. Shoolroy individually and as guardian of Julia Ann Shoolroy and Mary Elizabeth Shoolroy; also by Ross S. Shoolroy, Jr., Sophie B. Ross, and Ralph S. Daugherty. It was not signed by Effie I. Shoolroy. Partnership certificates as provided for in section 8099, et seq. of the Ohio General Code, were filed in the different Ohio Counties wherein the petitioner had business interest. All of the certificates filed were identical and contained the names and addresses of the seven individual partners included in the above partnership agreement, and other pertinent information to the effect that they were transacting business under the firm name and style of "FAIR PRICE STATIONS." The names of the stockholders who held stock in the petitioner *199 corporation, the names of the members of the partnership, the ages of each and the percentage of holdings of each in the corporation and in the partnership for the years ending on May 31, 1941, 1942, 1943 and 1944, are as follows: Interest in
Interest in Partnership
corporation
as changed each year
Relationship
Age in
during
for years ending May 31.
to Ross K.
Names
1941
1940-1941
1941
1942
1943
1944
Shoolroy
Ross K. Shoolroy
48
43%
40%
38%
20%
22-2/9%
Effie I. Shoolroy
46
45%
40%
38%
20%
22-2/9%
Wife
Ross S. Shoolroy
24
2,403%
6%
6%
10%
11-1/9%
Son
Julia Ann Shoolroy
17
2,403%
3%
3%
10%
11-1/9%
Daughter
Mary E. Shoolroy
16
2.403%
3%
3%
10%
1-1/9%
Daughter
Ralph S. Daugherty
34
2.403%
4%
4%
10%
11-1/9%
None
Sophie B. Ross
44
2.403% **
4%
4%
10%
None
None
Earl V. Bartchy *
44
None
None
4%
10%
11-1/9%
None
The following resolution was passed on May 31, 1940, at a special meeting of stockholders of Fair Price Stations, Inc.: "Whereas the success of the corporation in its earning power is directly dependent upon the executive management and whereas this management is limited to a few persons, and whereas these persons *200 now desire to devote their efforts as a co-partnership, it is resolved that the corporation lease all of its facilities to the partnership on the terms and conditions stipulated in a contract, a copy of which is herewith attached." Pursuant to the resolution of the stockholders of the petitioner corporation, an agreement was entered into between the Fair Price Stations, Inc., and "Fair Price Stations" referred to as the partnership. This agreement, executed May 31, 1940, provides in material part as follows: That the corporation leased to the partnership eight named gasoline filling stations, with option of lease, on the same terms, on any additional stations coming under the contract of the corporation; also (3) The Corporation agrees to furnish at delivery points all merchandise including motor gasoline, motor fuel, liquid fuel, and motor oil. The price at which these products shall be furnished shall be the delivered cost price plus the State and Federal taxes, except on motor fuels there shall be added one-half (1/2") cent per gallon which shall be regarded as lease rental. (4) The Corporation shall do all maintenance and repair, replacements, alterations, and shall make all changes. *201 (5) Taxes and insurance: All real estate taxes and personal property taxes (exclusive of taxes on inventory) and all insurance on buildings and equipment shall be paid by the Corporation. Taxes on inventory and insurance not excluded above, shall be paid by the Partnership. (6) Terms of payment for merchandise: Net 10 days. (7) Period of Lease and Contract: This lease and contract is made for a period of one year beginning June 1, 1940, subject to cancellation by either party on thirty days' written notice. Further, this lease shall be continued on and after May 31, 1941 from year to year on the same basis as set forth herein subject to thirty days' written notice by either party. (8) Inventory on hand as of June 1, 1940 shall be charged and paid for by the Partnership on the basis set up in the preceding paragraphs. Under the above contract, separate leases were made for each of the gasoline stations, the said leases being identical, except as to the description of each of the stations leased. Each lease provided in material part that the gasoline filling station described, was leased by petitioner to the partnership for one year, commencing June 1, 1940, to continue from year to *202 year, unless canceled upon 30 days notice by either party; that the lease was part of a general lease, attached; and that the rental was 1/2 cent per gallon on all motor fuel or gasoline delivered to the plant. The approximate value of the petitioner's property in May 1940 was $150,000, all of which became subject to this arrangement with the exception of properties valued at $36,000, so that the value of the property turned over to the partnership was approximately $114,000. The $36,000 in assets consisted chiefly of land and buildings, from which rent was received, to the extent of about $420 a month. The petitioner also retained a jobbing business under which petitioner sold gasoline to the extent of about $100,000 a year, to other stations which also sold its gasoline under the same sales policy. The $20,000 subscribed for the interest in the partnership was paid in cash. The two minors paid cash, out of money of their own, from dividends received upon their stock in the petitioner corporation. The petitioner filed its income tax returns for the different years here involved and related years in which the following information was disclosed: Fair Price Stations, Inc.
1937
1938
1939
1940
1941
Net income
$18,064.58
$82,701.92
$70,340.12
$42,817.07
$19,109.58
Salaries paid -
Roy K. Shoolroy, pres.
3,600.00
* *203 11,500.00
* 15,000.00
* 6,000.00
* 6,000.00
Effie Shoolroy, sec.
0
600.00
600.00
600.00
600.00
S. B. Ross, Treas.
0
* 3,125.00
* 2,503.03
* 875.00
0 *
Roy S. Shoolroy,
vice president
0
0
0 * 625.00
0 *
The partnership, under the arrangement described above, conducted exclusively a "cut rate" oil and gasoline retail business. The gasoline was purchased from petitioner. Other products such as oil, greases and anti-freeze were purchased from companies other than petitioner. The partnership and the petitioner for the years herein involved kept separate and complete books of account. Petitioner and the partnerships in general at all times sold gasoline from one to one and one-half cents a gallon under established market. Over a period of years there has been in Ohio in general a margin of about 5 cents per gallon between retail price and cost of gasoline delivered. Labor cost petitioner about 9/10 cent to 1-6/10 cents a gallon, and "burden cost," including supervision, depreciation, maintenance, heat, light and power was about the same amount. The petitioner retained the 3 per cent allowed by Ohio law out of the 4 cent tax for evaporation, shrinkage, etc., on gasoline, therefore retained $.0012 a gallon. It also retained a discount which it obtained for paying cash for gasoline. *204 These items were not passed on to the partnership. The partnership filed its income tax returns for 1940 and 1941. Pertinent information of these two years, along with information on the partnership return filed for 1937, is as follows: Fair Price Stations, Partnership
1937
1940
1941
Net income
$77,267.73
$83,048.89
$84,260.51
Salaries Paid: - Balance represents distributive share of profits.
Ross K. Shoolroy **
Salary
6,000.00
6,000.00
4,950.00
Balance
33,546.88
28,464.48
26,689.49
Effie Shoolroy
Salary
Balance
30,863.13
28,464.48
26,689.49
Sophie B. Ross
Salary
2,205.25
2,100.00
2,400.00
Balance
1,341.87
2,846.45
2,809.43
Ralph S. Daugherty
Salary
$1,968.73
$2,400.00
$2,825.00
Balance
1,341.87
2,846.45
2,809.43
Ross S. Shoolroy
Salary
1,387.63
1,600.00
Balance
4,269.67
4,214.13
Julie Ann Shoolroy
Salary
Balance
2,134.84
2,107.05
Mary E. Shoolroy
Salary
Balance
2,134.84
2,107.05
Earl V. Bartchy
Salary
2,250.00
Balance
2,809.44
During the year 1940, there was pending in the office of the revenue agent in charge at Cleveland, Ohio, a tax matter pertaining to Fair Price Stations, Inc., for the year 1939, under the provisions of section 102 of the Revenue Act *205 of 1938. It was proposed that a deficiency be asserted against Fair Price Stations, Inc., for the year 1939, in the amount of $11,327.54. In connection with that matter there was filed in the office of the revenue agent in charge in Cleveland, Ohio, on September 16, 1940, a document described as "a protest against the findings of the revenue agent with respect to their tax liability for 1939." That protest was signed by R. K. Shoolroy, as president of the Fair Price Stations, Inc., and was sworn to by him on September 12, 1940. The protest sought to demonstrate to the revenue agent in charge at Cleveland, Ohio, that it was necessary for the Fair Price Stations, Inc., to accumulate a large cash surplus. The protest set forth in part the following: All of the new stations were paid for by reinvesting earnings, except $49,909.00 the net investment made in the Company after 1931, Note that we opened one station each year. * * *
The definite plan of our Company has been to be financially independent; it had not been our plan to pay lavish dividends but to plow back earnings, acquire more stations and be safeguarded against the hazards and contingencies of our business. Had we pursued the *206 policy of paying large dividends, we could not have expanded to eight stations. At the present time, it is probably possible for us to borrow money at banks, but when we needed it for expansion, the banks at Mansfield and Akron refused the Company credit on the grounds that our business was too financially hazardous. We decided then, and have not changed our views, that, if we could, we would put the Company in a position that it would not be necessary to seek financial aid from banks. We are, we believe, on the way to that position today and it is our firm resolution to continue that way. FINANCIAL HAZARD: The largest hazard we have is the threat of price wars. We sell gasoline at cut rates and any small company such as ours, underselling the major oil companies with all their financial strength is in a hazardous business and must protect itself as well as it can with a substantial cash reserve to survive. Conditions have been such in the producing fields, with large surplus stocks, that a company such as ours can operate advantageously. If the producing fields reduce production, the supply will be less and the major oil companies will then probably start a price war. We must protect *207 ourselves with all means possible and have attempted to do so by retaining cash reserves. At the present time, we do not feel too well protected, but believe if we can establish a cash reserve of approximately $100,000.00, we will be able to resist any price wars unless they extend for too long a period. Our operations can lose money just as fast as profit can be made. A difference of less than one cent a gallon will result in a loss at most of our stations. We have been fortunate not to have been in a prolonged, severe gas war to date, but it may come at any time. When and if it does come, we will use all of our initiative and resources to fight it. It probably will not come at all our locations at the same time, but we cannot afford to risk that dangerous assumption. If we reached the stage of needing money during a gas war, can any one imagine the banks loaning money at such a time? Our only protection is to have ample liquid resources - and best of all cash. It was also set forth that there was need by the corporation, for large earnings in order to carry through an expansion and modernization program as well as a plan to erect a large office building. * * * We planned to rent *208 a portion of the building to tenants and procured the promise of two firms to locate in the building; however, we were unable to make a satisfactory lease with a local utility company who were to occupy the ground floor of the building. We have the plans and will erect the building when we find a suitable tenant. We are submitting a copy of letter from Mr. Curry in 1939, copy of contract, and his affidavit to support our statement. * * *
EXPANSION AND MODERNIZATION: We contemplate the addition of at least one station in 1940. To date, we have not found the proper place, but when we do, we will require an investment of between $30,000.00 and $40,000.00 for this station. The need for modernization is becoming more acute every day. Our leading competitors have been, and are today, razing stations built only a few years ago to set up new streamline design buildings with modern lighting, modern driveway, layouts, etc. While our buildings have many years of usefulness yet, they are becoming obsolete and we are suffering from the competition of streamline layouts. We must convert all our conventional design stations in the course of the next few years to modern streamline set up. This not *209 only refers to the building but also to the driveways, lighting, equipment, etc. * * *
Need of modernization at Akron, our leading station is self-evident, as our volume of sales has been slipping for two years. The cost of modernizing this one station will be approximately $10,000.00. There has been provided in our depreciation reserves as of January 1, 1940, as follows: Building
$2855.48
Station Equipment
994.15
Driveways
402.32
$4251.95
The additional capital required in addition to the depreciation reserves already provided is $5748.05. * * *
SELF INSURANCE: We need a substantial reserve to provide for other contingencies which other companies possibly cover by insurance, as we carry no public liability or property damage insurance. By carrying our own insurance, since the incorporation of the Company, we have probably saved $6000.00 in premiums. A reserve of $6000.00 is, of course, inadequate for any major claims for there is always the possibility of a claim for damages. We try to prevent accidents at our places of business by all reasonable safeguards, but we must have adequate resources to meet claims if they are presented. A reserve of $15,000.00 is certainly not excessive. To properly *210 reflect this on our records, we should transfer this money to a special account and appropriate a similar amount of surplus, but regardless of the accounting, the risk and hazard is there. We do not carry fire insurance at certain locations nor windstorm insurance at any location. The average investment in each station of tangible assets without land, is approximately $12,500.00. We would not attempt to insure all items, and it is unlikely that a casualty will occur at more than one place at a time, but certainly with a total insurable property valuation of $100,000.00, a $10,000.00 reserve is not exclusive. Here, again, we should set aside a portion of the cash and appropriate a like amount of surplus. Possibly the accounting is not correct, but the risk and hazard is there. * * *
INTENT: We believe we have fully proven by a preponderance of evidence that larger dividends were unwise and financially unsound. There remains the question of intent to avoid surtax on personal income of stockholders. * * *
It is my firm conclusion that considering all hazards and risks carried by the Company, it should have a reserve of $100,000.00 in cash. We might have carried reserves in separate accounts *211 or investments. The money was available, however, as readily as though it were invested in government bonds and set in separate accounts. Earl V. Bartchy is an accountant. He had done accounting in the oil and gas business from 1930, employed as comptroller and office manager of an oil company doing a business of refining, marketing and retail service stations, until March 1941, when he joined Fair Price Stations. He had worked with R. K. Shoolroy in that company in 1930-1931. His income prior to March 1940 had been about $350 a month, but he joined Fair Price Stations for $250 a month with the understanding that he would participate in the partnership. He purchased a 4 per cent interest therein on September 30, 1941, from R. K. Shoolroy and Effie I. Shoolroy, paying 4 per cent of the capital investment, plus accrued earnings to that date. From May 31, 1944, he has owned a one-ninth interest in the partnership. Bartchy had done all of the buying for the partnership for two or three years before the date of trial. There had been no limitation on his rights to contract or buy. The provision in the partnership agreement requiring majority consent to contracts over $100 has not been carried *212 out in the partnership. R. S. Daugherty's duties were the selection and training of managers and assisting managers in the training of personnel. Sophie Ross was office manager, and in charge of the books until Bartchy came into the partnership. Ross S. Shoolroy, Jr., first worked in the field, then assisted Mrs. Ross, then took charge of the advertising and premium department. The rental figure of 1/2 cent a gallon, agreed to in the contract between petitioner and the partnership, is used by major oil companies in Ohio in leasing to dealers, and in general such leases are on a basis of a one-day cancellation notice. The partnership is still in existence, and the contract between it and petitioner is still in effect. As time has gone on, more and more authority has been granted to the partners who work in the business. At the time of trial, R. K. Shoolroy was receiving from the partnership a salary of $300 a month, and nothing else, except his percentage interest. Opinion In arriving at the deficiency here involved, the Commissioner included in petitioner's income the net income of the partnership, under the provisions of section 22 (a) of the Internal Revenue Code. [1] *214 The petitioner *213 urges error in such action. The respondent, in substance, argues that petitioner leased its stations to Fair Price Stations for a nominal rental, that the partnership and transactions with it lacked business purpose, that the petitioner was motivated by the surtax on undistributed profits effective June 22, 1936, in forming the partnership in December 1936, and in ending that partnership was influenced by section 13 of the Revenue Act of 1938, providing exemption from surtax on undistributed profits for corporations with net income of less than $25,000; and again was influenced by the excess profits tax enacted by the Second Revenue Act of 1940, approved October 8, 1940, in the formation of the second partnership. After carefully reviewing the facts presented to us and cases cited by both parties, we come to the conclusion that there was business purpose in the organization and operation of the partnership, and that the Commissioner erred in including its income with that of the petitioner. That there was admittedly some consideration of the tax element is not controlling. Stanley D. Beard, 4 T.C. 756. This case is far indeed removed from that of a corporation, or other entity, organized for some temporary purpose "having no relation to business," and immediately put to death when the temporary object is attained. Gregory v. Helvering, 293 U.S. 465, relied on by the respondent. We see here a partnership, still after several years; in existence, and still carrying on actively the business for which it was created; that is, operating some eight gasoline filling stations in several cities. In the face of that fact alone, *215 it is not easy to arrive at any conclusion that there is no business purpose. We are affected here more by what has actually happened than by the perhaps mixed motives for setting up the partnership. The history is more important than any original plan. Regardless of tax motives entering into consideration in the beginning, this partnership has in fact transacted business, on no small scale. It has purchased largely, but not altogether, from the petitioner. In other words, it does some business which can in no manner be related to the petitioner. Its partners and their holdings are not identical with those of the petitioner. Since the first partnership in 1937 is pointed out as smacking of the same character as the second, it is worthy of note that R. K. Shoolroy had a 51 per cent interest therein - yet held only one share of stock in the corporation, while J. B. Richardson, apparently holding considerable of the corporate stock though the record is not clear on that point, did not go into the partnership at all. Nor do we see so little in the reasons for the partnership as does the respondent. R. K. Shoolroy, the principal figure, was launching out into new enterprises of considerable *216 size, and partners, with a close personal interest in their business, would naturally assume more responsibility than stockholders in a corporation managed by him. The buying, in fact, largely passed to Bartchy, R. K. Schoolroy's former associate, who came to the partnership within a year after its formation. That he became guardian of his two children seems inconsequential. He became so about March 1938, nearly two years before the second partnership, and after the end of the first. The petitioner relies largely on Seminole Flavor Co., 4 T.C. 1215, where a corporation's stockholders formed a partnership, wherein they held the same interests, and we held that the Commissioner erred in including the partnership net profits in the corporation's gross income, under section 45, Internal Revenue Code. The respondent strongly argues that the case is distinguishable in that there the corporation was in financial difficulties, while here there were none. We do not discern a material distinction. In either event, whether the partnership was absolutely necessary because of finances (and whether it would improve finances in the Seminole case was conjectural) or only preferable for some less *217 urgent reason, the reasons here were connected with business, and business was engaged in, and still continues. In the Seminole case we said: * * * Why a subsidiary corporation or a string of company owned bottling plants should be rejected in favor of a limited partnership is beside the point. We must look to the things that were done and not to what might have been done; and it is here established that a limited partnership was decided upon, was organized, and was thereafter operated. * * * So here it seems to us largely immaterial that the corporation might have carried on the business. Unless some good reason appears, the petitioner should not be required to adopt one mode of transacting business over another. We are unable to find such reason here. We can not, on these facts, brand the partnership as a sham. Though two minors were involved, their corporate interests, dividends on which furnished cash to pay for their interests in the partnership, had been given them nearly two years earlier, and R. K. Shoolroy's wife had long held her interests, which did not originate with him, but from inheritance, as did those of his son. All paid capital, in cash, into the partnership. Indeed, *218 we do not understand the respondent to attack the partnership for reasons such as have appeared in numerous cases, but only that the corporation, in effect, created it without reason, to syphon off its profits, which it is said, is no business purpose. It is urged, in substance, that the contract between corporation and partnership is such as to accomplish that purpose. The contract, on the evidence before us, seems to follow, at least in large degree, a pattern followed by major oil companies in Ohio in establishing filling stations. Considering the narrow "spread" between purchase price and sales price of gasoline in the "cut rate" business conducted by the partnership, and earlier the petitioner, it seems to us that the contract is not out of reason, nor such as to brand the whole matter as without business purpose, and sham. There appears on the contrary, some business acumen used in the matter, for the petitioner did not let the partnership get the benefit of either discounts or allowance for evaporation, and these items apparently increased the 1/2 cent a gallon which was its rental. If the whole idea was to shift profit to the partnership, this element appears to have been overlooked. *219 Moreover, the petitioner escaped the hazards of the business, and became a seller at a fixed price. It is suggested by the respondent that statements made by R. K. Shoolroy in September 1940, in a protest as to taxation of the corporation on undistributed profits, are not consistent with the formation of a partnership. We do not attach so much importance to the statements as does the respondent. The protest, no doubt, enlarged upon the necessity for not distributing corporate profits, yet the fact remains that for reasons connected with business, even though tinged with tax consciousness, a partnership was formed to, and did and does, transact such business. Moreover, considering the limited investment in the filling stations and the return, without the usual business hazards, obtained through the contract with the partnership, we can not see that the formation of the partnership is inimical to the corporate objects discussed in the protest. As for the respondent's idea that the formation of partnership on May 31, 1940, was caused by the excess profits tax, it is only necessary to recall that the Second Revenue Act of 1940, which included the excess profits tax provision, was not introduced *220 (as we take judicial notice) until August 27, 1940, and was approved October 8, 1940. The petitioner retained no inconsiderable business and income upon which tax, on the respondent's theory, by a different contract, might have been shifted to the partnership. This is not consistent with a mere intent to get essentially the same income in a different way, through a partnership, but bears out, we think, a real desire to give key personnel added personal interest in the business, and permit R. K. Shoolroy to engage in other activity. The partnership was by no means an alter ego for the corporation. These facts, and others as to dates following the taxable years, are found relevant to test the question of business purpose, for a business purpose is indicated by continuance of business. Under all the record, we do not think they indicate any change of purpose after the taxable years. Petitioner's officers were under no compulsion to conduct their business to produce the largest tax. Koppers Co., 2 T.C. 152. In our opinion, there was business purpose, carried out, in the partnership, and the Commissioner erred in adding the partnership income to that of the petitioner. On account of *221 other items in the deficiency notice, not made the subject of assignment of error. Decision will be entered under Rule 50. Footnotes
*. The record is indefinite as to whether J. B. Richards, who did not become a member of the partnership, held stock in the corporati n on December 11, 1936, and January 1, 1937. He held 55 shares when the corporation was formed in 1931, and sold 165 shares to R. K. Shoolroy on November 1, 1937.
**. Since these figures total more than 100 per cent, some slight error is apparent.↩
*. Mr. Bartchy became associated with Fair Price Stations March 17, 1941. ↩
*. The schedule for these years as to these officers disclosed that they used their entire time for the corporation.
**. In 1945 Ross K. Shoolroy was receiving a salary of $300 a month from the partnership.↩
1. SEC. 22. Gross Income. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any ponitical subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *